## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| RICARDO FERNANDEZ, <br><br> Plaintiff, <br><br> v. <br><br> OFFICER M. RODRIGUEZ, Star No. 12243, OFFICER S. BERANEK, Star No. 6356, and CITY OF CHICAGO, an Illinois municipal corporation, <br><br> Defendants. | No. 09 CV 4297 <br> Judge James B. Zagel |

### MEMORANDUM OPINION AND ORDER

Plaintiff Ricardo Fernandez ("Fernandez" or "Plaintiff") is an individual residing in the City of Chicago in the Northern District of Illinois. Defendant Officer Steve Beranek is a duly appointed officer of the Chicago Police Department and resides in the City of Chicago. Defendant Officer Marian Rodriguez is a duly appointed officer of the Chicago Police Department and resides in the City of Chicago. The City of Chicago is a municipal corporation operating in the Northern District of Illinois.

Plaintiff brings a § 1983 action for false arrest, false imprisonment, and deprivation of substantive due process. Defendants seek summary judgment on undisputed facts.

I. BACKGROUND

In the early morning hours of June 15, 2008, Plaintiff went to a bar on the northwest side of Chicago. He left the bar at around 4:40 a.m. and headed to the Belmont and Central intersection to try to catch a bus to a friend's barbeque.

Fernandez had about six beers over the course of the evening. He testified at his deposition that he takes Lexipro for depression and anxiety, but the last time he took Lexipro was three or four days prior to the incident.

Plaintiff waited for the bus at Belmont and Central for over an hour. While he was waiting, two teenage males and one teenage female came to him and told him he could not wait for the bus at that location. The individuals called to a dog and tried to "set" the dog on Ricardo. According to plaintiff's deposition the dog was behind a fence. His affidavit denied this but the deposition trumps the affidavit. See *Velez v. City of Chicago,* 442 F.3d 1043 (7th Cir. 2006).

Fernandez called 911. Police arrived on the scene, but by the time they had arrived the teenagers and the dog had retreated into a residence. The police officers were later identified as Officers Steven Beranek and Marian Rodriguez. When they arrived, Fernandez appeared to be wearing military fatigues or apparel.

Neither of the officers saw any other people nor any dogs in the area. Fernandez would not answer Officer Beranek's questions, including requests for his home address. Fernandez complained of his neighbor's dog barking. Seeing no dog and not getting any answer at the residence, the police left the scene.

After the police left, the teens and the dog came out again. This time, the female of the group actually chased Fernandez across the street, attempting to hit him. Fernandez remained on the far side of the street and again called 911.

Fernandez ultimately called 911 seven times. To the Chicago Office of Emergency Management Communications ("OEMC") dispatcher, he said "I take care of my fucking whatever you're supposed to do" and "I'm going to have to do something about it" and "I can

2

fucking eliminate the mother fuckers, okay?" and "Where the hell is the fucking law?" Fernandez admits that he was very angry when he called 911.

The officers were dispatched a second time to the scene. When Officer Beranek returned to the scene the second time, Fernandez was in the middle of the street.[1] There was no one else in the area. He appeared to be angrier than the last time and continued to complain about dogs barking. He was swearing. The officers found him difficult to understand. He stated that if the police did not help him, he would go home and kill his neighbor and his neighbor's dog. Rodriguez heard him say a dog had assaulted him and he would take the law into his own hands. In speaking Fernandez was jumping from one topic to another in an incoherent way. Fernandez disputes this description, stating only that was trying to explain what had happened to him with the teenagers and the dog the second time.

The officers decided to transport Fernandez to Swedish Covenant Hospital for a mental evaluation because of the way he was dressed, the fact that he was in the middle of the street, and his 911 threats to another individual. They believed he was a threat to himself or others. Officer Beranek and Officer Rodriguez placed handcuffs on Fernandez which they believed necessary for officer safety.

At Swedish Covenant, Officer Rodriguez provided her name and badge number to the staff as part of a "Petition for Involuntary Admission." Pam Parrish, a Swedish Covenant employee, signed the Admission and in fact admitted Plaintiff. Officer Beranek completed the Hospitalization Case Report required under these circumstances.

---

[1] Fernandez disputes Defendants' characterization of him as being in the "middle of the street." But his own affidavit says that as the officers arrived, he "began to cross over to the north side of Belmont."

Fernandez believes he was arrested but agrees that he was never charged with a crime associated with the incidents and never had to go to court. Both officers were trained on the relevant state law and municipal ordinances, and on handling individuals they believed were undergoing an episode of mental illness.

II. ANALYSIS

The first issue contested by the parties is whether or not Ferndandez was arrested. The suit does not, however, depend on whether one characterizes the police as having arrested Fernandez or having simply detained him for mental illness screening. If they had probable cause to detain the man for transport to a hospital for mental evaluation, there is no lawsuit. *See Chathas v. Smith*, 884 F.2d 980, 987 (7th Cir. 1989); *see also Villanova v. Abrams*, 972 F.2d 792, 795 (7th Cir. 1992) ("A civil commitment is a seizure, and may be made only upon probable cause, that is, only if there are reasonable grounds for believing that the person seized is subject to seizure under the governing legal standard, not here challenged.")

Probable cause is an absolute defense to a claim of wrongful arrest asserted under section 1983 against police officers. *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008). A police officer has probable cause to arrest if, at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. In determining whether an officer had probable cause, the court steps into the shoes of a reasonable person in the position of the officer. *Id.* (citations and quotations omitted).

4

> The on-the-spot determination often requires an exercise of judgment, which turn[s] on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules. In recognition of the endless scenarios confronting police officers in their daily regimen, courts evaluate probable cause not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person in the position of the arresting officer—seeing what he saw, hearing what he heard. In practice, then, it can be said that [p]robable cause—the area between bare suspicion and virtual certainty—describes not a point but a zone, within which reasonable mistakes will be excused.

*Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994) (citations, quotation marks and ellipsis omitted). Probable cause questions typically get resolved by the jury "though a conclusion that probable cause existed as a matter of law is appropriate when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Id.*

The officers did have probable cause to seize Fernandez given their reasonable belief that Plaintiff was delusional. He was claiming two attacks by three persons and a dog whose presence at the scene they simply could not confirm. Fernandez was - by his own admission - "very angry" and had been in and out of the street. He was wearing military-style clothing despite no apparent connection to the armed forces. He had been at a bar drinking multiple beers until 4:40 a.m. He had made numerous calls to a police dispatcher.[2] With all the circumstances

---

[2] The parties should note that I stop here in considering the facts known to the officers. I do not consider either the precise number of calls (seven) or the undeniable and in fact admitted content of those calls. The latter included obvious threats such as Fernandez's statement that "I take care of my fucking whatever you're supposed to do" and "I'm going to have to do something about it" and "I can fucking eliminate the mother fuckers, okay?" and "Where the hell is the fucking law?" These statements were apparently unknown to the officers at the time; both officers disclaim any memory of the dispatcher's instructions other than to simply check out the call. Moreover, the collective knowledge doctrine is not in play because the dispatcher neither communicated the information nor even simply told the officers to detain Fernandez. *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992) (collective knowledge doctrine requires: (1)

taken together, Defendant Officers had probable cause to seize Plaintiff for the sole purpose of transporting to Swedish Covenant for a mental evaluation.

Because the case against the officers cannot be made, the City cannot be found liable.

III. CONCLUSION

Summary judgment on all counts is GRANTED to Defendants.

ENTER:

James B. Zagel
United States District Judge

DATE: May 2, 2012

---

that the officer effecting the stop act in objective reliance on the information received; (2) that the law enforcement officer providing the information had a reasonable suspicion to justify the stop; and (3) that the stop conducted was no more intrusive than would have been permissible for the officer requesting it.) As far as the officers knew, they were simply to respond to Fernandez's complaint and investigate it.